UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____           │
│ DATE FILED: 11/25/15                 │
└─────────────────────────────────────┘
```

---

SEYED AMIN GHORASHI SARVESTANI,

             Petitioner,

    – v.–

UNITED STATES OF AMERICA,

             Defendant.

**MEMORANDUM
OPINION & ORDER**

13 Cr. 214 (PGG)

13 Civ. 7708 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

      On May 8, 2013, Petitioner Seyed Amin Ghorashi Sarvestani pleaded guilty to conspiracy to violate the International Emergency Economic Powers Act (the "IEEPA" or the "Act"), 50 U.S.C. §§ 1701-07, as well as 31 C.F.R. §§ 560.203 and 560.204, in violation of 18 U.S.C. § 371.  On August 14, 2013, this Court sentenced Petitioner to thirty months' imprisonment and a $100,000 fine.  See Judgment (Dkt. No. 25).[1]  Petitioner now moves, pursuant to 28 U.S.C. § 2255, to vacate his sentence.  (No. 13 Cr. 214, Dkt. No. 50; No. 13 Civ. 7708, Dkt. No. 1)  For the reasons stated below, Petitioner's motion will be denied.

## BACKGROUND

      Information 13 Cr. 214 charges Petitioner with conspiring to "export, cause to be exported, sell, and supply, directly and indirectly, from the United States, goods, technology, and services, to wit, satellite telemetry and other equipment supplied by companies in the United States, to customers located in Iran, without obtaining the required approval of the Office of Foreign Assets Control, within the United States Department of the Treasury, in violation of [the IEEPA,] Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations,

---

[1] Unless otherwise indicated, all citations are to the docket in 13 Cr. 214.

Sections 560.203 and 560.204." (Information 13 Cr. 214 (Dkt. No. 13) ¶ 5).  The Information

alleges that Petitioner's criminal conduct took place between November 2005 and 2012.  (Id. at

¶ 4)

"The IEEPA . . . confers on the President certain powers to respond to any threat

to the national security, foreign policy or economy of the United States that is 'unusual and

extraordinary' and that 'has its source in whole or substantial part outside the United States.'"

United States v. Dhafir, 461 F.3d 211, 213 (2d Cir. 2006) (quoting 50 U.S.C. § 1701(a)).  "These

powers may be exercised only if and when the President declares a national emergency with

respect to the threat, 50 U.S.C. § 1701(a), in which event '[t]he President may issue such

regulations, including regulations prescribing definitions, as may be necessary for the exercise of

the authorities granted by this title.'"  Id. (quoting 50 U.S.C. § 1704).  The IEEPA makes it

"unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of

any license, order, regulation, or prohibition issued under [the Act]."  50 U.S.C. § 1705(a).  The

IEEPA provides that "[a] person who willfully commits, willfully attempts to commit, or

willfully conspires to commit, or aids or abets in the commission of, an unlawful act [as defined

in the Act] . . . shall, upon conviction, be fined not more than $1,000,000, or . . . may be

imprisoned for not more than 20 years, or both."  50 U.S.C. § 1705(c).

"Pursuant to [an Executive Order], on November 17, 1987, [the Office of Foreign

Assets Control of the U.S. Department of the Treasury ('OFAC')] issued the Iranian Transaction

Regulations (the 'ITR')."  Weinstein v. Islamic Republic of Iran, 299 F. Supp. 2d 63, 68

(E.D.N.Y. 2004).  These regulations "prohibited, inter alia, the importation of goods and services

from Iran and the exportation, reexportation, and sale or supply of goods, technology or services

to Iran."  Id. (citing 31 C.F.R. §§ 560.201, 560.204).  "On March 15, 1995, President Clinton

2

issued [Executive Order] 12957, declaring a national emergency regarding actions and policies

of Iran and imposing additional sanctions against Iran, invoking the authority of, inter alia, the

IEEPA." Id. (citing Executive Order 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995)). "Thereafter,

the ITR were amended to reflect the broader prohibitions imposed by [Executive Order 12957

and other Executive Orders] regarding Iran and affecting goods, technology, services and related

financial transactions, and new investment." Id. (citing 31 C.F.R. §§ 560.204-208).

      31 C.F.R. § 560.204 – one of the Iranian Transaction Regulations – provides that

> Except as otherwise authorized pursuant to this part, and notwithstanding any
> contract entered into or any license or permit granted prior to May 7, 1995, the
> exportation, reexportation, sale, or supply, directly or indirectly, from the United
> States, or by a United States person, wherever located, of any goods, technology,
> or services to Iran or the Government of Iran is prohibited, including the
> exportation, reexportation, sale, or supply of any goods, technology, or services to
> a person in a third country undertaken with knowledge or reason to know that:
>
>     (a)    Such goods, technology, or services are intended specifically for
>             supply, transshipment, or reexportation, directly or indirectly, to
>             Iran or the Government of Iran; or
>
>     (b)    Such goods, technology, or services are intended specifically for
>             use in the production of, for commingling with, or for
>             incorporation into goods, technology, or services to be directly or
>             indirectly supplied, transshipped, or reexported exclusively or
>             predominantly to Iran or the Government of Iran.

31 C.F.R. § 560.204.

      Another Iranian Transaction Regulation – 31 C.F.R. § 560.203 – provides that

> (a)    Any transaction on or after the effective date that evades or avoids, has the
>       purpose of evading or avoiding, causes a violation of, or attempts to
>       violate any of the prohibitions set forth in this part is prohibited.
>
> (b)    Any conspiracy formed to violate any of the prohibitions set forth in this
>       part is prohibited.

31 C.F.R. § 504.203.

On May 30, 2013 – after the time period in which the Information alleges Petitioner's criminal conduct took place (i.e., November 2005 to 2012, see Information 13 Cr. 214 (Dkt. No. 13) ¶ 4), OFAC issued "General License D," which provides that certain transactions are exempt from the prohibitions of the ITR.  (See Def. Sent. Br. (Dkt. No. 20), Ex. 5 ("General License D"))  General License D authorizes, inter alia, "[t]he exportation or reexportation, directly or indirectly, from the United States or by U.S. persons, wherever located, to persons in Iran of consumer-grade Internet connectivity services and the provision, sale, or leasing of capacity on telecommunications transmission facilities (such as satellite or terrestrial network connectivity) incident to personal communications."  (Id. at 2)  General License D does not authorize "[t]he exportation or reexportation, directly or indirectly, of commercial-grade Internet connectivity services or telecommunications transmission facilities (such as dedicated satellite links or dedicated lines that include quality of service guarantees)."  (Id. at 3 (emphasis added))  The Annex to General License D states that "[r]esidential consumer satellite receive-only terminals, receiver equipment . . . designated EAR99 . . . ;[2] drivers, communications, and connectivity software for such hardware designated EAR99 . . . ; and services necessary for the operation of such hardware and software" are authorized for exportation and reexportation to Iran by General License D.  (Id. at 5)

On February 7, 2014, OFAC issued "General License D-1," which "replaces and supersedes in its entirety [General License D] . . . ."  OFAC General License D-1, Section (e),

---

[2] "If [an] item falls under the jurisdiction of the U.S. Department of Commerce and is not listed on the [Commerce Control List], it is designated EAR99.  The majority of commercial products are designated EAR99 and generally will not require a license to be exported or reexported."  Export Control Classification Number (ECCN), Bureau of Industry and Security, U.S. Department of Commerce, http://www.bis.doc.gov/index.php/licensing/commerce-control-list-classification/export-control-classification-number-eccn.

available at http://www.treasury.gov/resource-center/sanctions/Programs/Documents/iran_gld1.
pdf.  General License D-1 "clarifie[s] certain aspects of General License D, and add[s] certain
new authorizations relating to the provision to Iran of certain hardware, software, and services
incident to personal communications."  Sudanese Sanctions Regulations, 80 Fed. Reg. 8532
(Feb. 18, 2015).  The Annex to General License D-1 states that "[r]esidential consumer satellite
terminals, transceiver equipment (including but not limited to antennae, receivers, set-top boxes
and video decoders) designated EAR99 . . . and services necessary for the operation of such
hardware and software" may be exported and reexported to Iran.  OFAC General License D-1,
Annex, available at http://www.treasury.gov/resource-
center/sanctions/Programs/Documents/iran_gld1.pdf.

In connection with General License D-1, OFAC also posted a list of "Frequently
Asked Questions" about General License D-1 on its website.  It states that "[s]atellite terminals
and other equipment listed in category (4) of the Annex to [General License D-1] . . . shall be
deemed 'residential consumer' if the equipment is designated EAR99 . . . ."  Questions as to
Specific Software, Hardware, and Services Covered by General License D-1 for Iran and 31
C.R.F. § 538.533 for Sudan (the "Personal Communications GLs"),
http://www.treasury.gov/resource-center/sanctions/Programs/Documents/gl_d1_faqs_update.pdf.

## PROCEDURAL HISTORY

Petitioner pleaded guilty to Information 13 Cr. 214 on May 8, 2013.  Pursuant to a
plea agreement, Petitioner admitted that, during the period between November 2005 and 2012,
he had conspired to "export, cause to be exported, sell, and supply, directly and indirectly, from
the United States, goods, technology, and services, to wit, satellite telemetry and other equipment
supplied by companies in the United States, to customers located in Iran, without obtaining the

required approval of [OFAC]." (Information 13 Cr. 214 (Dkt. No. 13) ¶ 5; Plea Tr. (Dkt. No.

68))

        In the plea agreement, Petitioner agreed that he

> [would] not file a direct appeal; nor bring a collateral challenge, including but not
> limited to an application under Title 28, United States Code, Section 2255. . . ; nor
> seek a sentence modification pursuant to Title 18, United States Code, Section
> 3582(c), of any sentence within or below the Stipulated Guidelines Range of 57 to
> 71 months' imprisonment . . . .

(Govt. Opp. Br. (Dkt. No. 59), Ex. A (Plea Agmt.) at 4)  During Petitioner's plea allocution, he

stated that he had read the plea agreement before he signed it, discussed it with his attorneys, and

"fully under[stood] all the terms of the plea agreement before [he] signed it." (Plea Tr. (Dkt. No.

68) at 15)  Petitioner also acknowledged that he "[was] giving up [his] right to appeal [his]

sentence, so long as [the Court] sentence[d] [him] to 71 months['] imprisonment or less." (Plea

Tr. (Dkt. No. 68) at 16)

        During his plea allocution, Petitioner told the Court that between 2005 and 2012,

he had conspired with another person to sell American-made goods to Iran, arranging for the

goods to be shipped to Iran through a third country.  Petitioner also admitted that he had not

obtained permission from a United States agency to sell these goods to Iran, and that he knew "at

the time" that his conduct violated U.S. law:

> Between 2005 and 2012, I agreed with my other partner to help and facilitate
> some certain transactions involving some American goods being shipped
> indirectly through [a] third country to Iran.  I kn[e]w at that time [that] those
> goods were ultimately going to Iran, and there[ wa]s no permission from the
> United States government or any other U.S. agency to . . . sell them or ship them
> to Iran. . . .  I kn[e]w at that time [that] this was unlawful under American law.

> In furtherance of this agreement with the others, in about April 2011, a co-
> conspirator of mine caused . . . $16,947 to be wire transferred to one of the . . .
> American suppliers, in New York City, . . . to buy some American goods from the
> supplier in Virginia Beach, Virginia.  And that $16,947 . . . was . . . for [the]
> purchase of those items.

> During [that] . . . seven year[] period, my share of [the] profit from all those businesses was almost $54,318.62.  And as to my knowledge . . . [m]ost of the items which [have] been sold, which [have] been the American original goods, [were] either routers or cables or switch, satellite communication mainly to the Internet satellite service providers in Iran.

(Id. at 17-18)

On August 14, 2013, the parties appeared for sentencing.  Before imposing sentence, this Court asked the parties to address the nature of the equipment Petitioner had supplied to Iran.  (Sent. Tr. (Dkt. No. 45) at 5)  Although acknowledging that General License D had been promulgated after Petitioner's criminal conduct had been committed, the Court also asked the parties to address whether – "as a result of the May 13th, 2013 change in regulation" – the equipment Petitioner had sold to Iran could now lawfully be sold to Iran:

> I understand that the equipment at issue includes equipment that was designed for use in positioning, monitoring, and controlling satellites, and satellite antennae. And defense [counsel] asserts that this equipment may now be lawfully exported to Iran as a result of a May 13th, 2013 change in regulation. . . .  The government says that it would be illegal, today, to export this equipment to Iran. . . .

(Id. at 4-5)

Defense counsel responded as follows:

> I believe, your Honor, that there is no question the vast majority of the products that are at issue here are now legal.  What the government points to is the beacon receivers. . . .  [A] beacon receiver is just that, it is a receiver.  And under Category [4] of [the Annex to General License D], it is a receiver. . . .  [A] beacon receiver . . . receives the beacon from the satellite working in conjunction with a tracking controller. . . .  The tracking controller . . . moves the antenna so that it can actually track satellites and get the beacon. . . .  [T]his conduct, even with the beacon receivers, is[] now lawful. . . .  The customer here is a smaller version of Comcast or Time Warner.  It is a company [whose] sole purpose is to provide internet connectivity and communication to the general population in Iran, something that Iran, the government of Iran, seeks to jam.

(Id. at 7-9) (emphasis added)

7

In addressing these matters, the Government contended that not all of the equipment Petitioner had provided to Iran was covered by General License D, because some of the parts at issue "were designed for controlling satellites." (Id. at 16)  The Government's primary argument as to General License D, however, was that it was irrelevant, because that regulation had been issued "after the fact," when all of Petitioner's criminal conduct had already taken place:

> [T]he [Presentence Investigation Report ("PSR")] talks about several specific transactions that [Petitioner] was directly involved in communications about. And those were the transactions involving . . . the particular satellite-related parts that are discussed in the PSR.
>
> Those parts we understand to be parts that are used for controlling satellites. . . . I think the fact that . . . various goods used to control satellites were being bundled together and then sent on to an Iranian company, indicates that these parts were collectively parts that were designed for controlling satellites. . . . In addition, I think the PSR describes what the particular satellite piece from the U.S. was used for. . . . It is a part that is used to control satellites, [and] not a part that falls within the category [in General License D] of residential consumer satellite receive-only terminals.
>
> Your Honor, the other point about this is it is just a kind of after the fact fortuity that the regulations have changed somewhat to allow the shipment of certain kinds of technology to Iran, after [Petitioner's] conduct. In the context of companies that were basically in the business of providing goods to Iranian companies, some of the goods that were provided turned out later to be legalized for export to Iran. But that was not something that was in [Petitioner's] head. It was not something that was contemplated by these businesses which were just profit-making entities to distribute goods to Iran.
>
> So . . . I don't think it is extremely relevant that, after the fact, the U.S. has legalized some, but not all, shipments of residential satellite reception technology to Iran.

(Id. at 15-17)

In imposing sentence, this Court explained its reasons in detail, consuming seven transcript pages. (Id. at 21-28) This Court cited, inter alia, the level of deception employed by Petitioner, the intentional nature of his acts, his central role in the offense, the fact that he

engaged in the charged criminal activity for seven years, the fact that he sold hundreds of thousands of dollars' worth of U.S.-made equipment to Iran, his high level of sophistication, and the need for the sentence imposed to ensure general deterrence:

> Because there is a trade embargo in place that prohibits the sale of most U.S.[-]made goods to Iran, the U.S.[-]made equipment here was shipped through intermediary destinations such as Dubai, Malaysia, Hong Kong, and elsewhere, in order to obscure the goods' true destination. The defendant's companies did millions of dollars of transactions with Iranian companies over many years. And a percentage, not insignificant percentage, of that business involved the sale of U.S.-made products, including electronic equipment and including, specifically, the satellite-related equipment at issue here.
>
> The defendant is a highly sophisticated international businessman. Indeed, his counsel has pointed out this morning [that] one of the defendant's companies had as much as $200 million in revenue in 2011, alone. There is also no doubt that the defendant was well aware of the laws prohibiting the sale of U.S.[-]made goods to Iran. Indeed, in 2009, one U.S. supplier explicitly warned the defendant, in writing, to ensure that he complied with all U.S. export controls.
>
> Instead, the defendant instructed his employees to disguise the fact that his employees were selling this merchandise to Iran. He warned his employees to be careful in relaying inquiries about the merchandise from the Iranian buyers to the U.S. suppliers. They were told to, quote "be careful about this subject" unquote, to address the queries by telephone, and to never use email.
>
> As a result of the defendant's conduct, his employees lied to U.S. customs inspectors as to the ultimate destination of the merchandise.
>
> There is also evidence that the defendant was kept apprised of the progress of the illegal shipments, and that he monitored the illegal shipments.
>
> The defendant's conduct took place over a number of years. Why the defendant engaged in this conduct, that he knew to be illegal, is largely a mystery. He is a millionaire many times over. . . .
>
> I conclude that the defendant engaged in extremely serious criminal conduct. The trade embargo against Iran reflects the fact that it is a nation that actively supports terrorism. The trade embargo has been a critical element in the international community's efforts to pressure Iran to end its support of terrorism.
>
> Here, this defendant knowingly and intentionally chose to violate U.S. law designed to enforce the trade embargo. He took steps to actively conceal that violation and to mislead U.S. customs inspectors. . . .

9

[I]ntentional criminal conduct of this sort, committed by a highly sophisticated businessman, cannot be condoned. The sentence imposed must be sufficient to serve the objective of general deterrence. The message cannot go out that the U.S. trade embargo against Iran can be violated without fear of serious consequences. . . .

At the end of the day, what we have is someone who was highly sophisticated, was warned of the law – in writing – and for reasons that we don't know, chose to disregard it.

I have no doubt that this experience is likely sufficient to deter Mr. Sarvestani from future violations of the law. But, I have to be aware of my responsibility to communicate to others who may be now violating the law, or who may be considering violating the law, that they will receive serious consequences if their violation of the law is detected.

In my judgment a sentence of 10 months is not sufficient to serve the objective of general deterrence, and that is why I have decided that a longer sentence is necessary.

(Id. at 22-24, 27, 30)

With respect to General License D, this Court acknowledged Petitioner's argument that "he only sold satellite communications for the general population of Iran to use to connect to the [I]nternet," as well as the Government's assertion that "some of the equipment at issue here has a role in monitoring, positioning, and controlling satellites and satellite antennas." (Id. at 23-24) This Court concluded, however, that whether or not the equipment at issue was designed for connecting to the Internet, and whether or not General License D allows the exporting of such equipment to Iran, General License D "was, concededly, not in effect during the many years that equipment was shipped, by the defendant, to Iran. And, accordingly, [the Court] cannot place reliance on the fact that, recently, a regulation has come into effect which permits the export of certain electronic equipment to Iran." (Id. at 24)

This Court went on to sentence Petitioner to 30 months' imprisonment, which represented a significant variance from the stipulated Guidelines range set forth in the plea

agreement.[3]  (Id. at 28)  At sentencing, Petitioner was informed that he had the right to appeal his

guilty plea "if [he] believe[d] that [his] guilty plea was unlawful or involuntary, or if there was

some other fundamental defect in the proceedings that was not waived by [his] guilty plea." (Id.

at 31)  He was also informed that he had "a statutory right to appeal [his] sentence under certain

circumstances . . . [and that] any notice of appeal must be filed within 14 days of judgment being

entered in [his] case." (Id.)  Judgment was entered on August 16, 2013.  (Judgment (Dkt. No.

25)  Petitioner did not file a direct appeal.

On August 28, 2013, Petitioner moved, pursuant to Federal Rule of Criminal

Procedure 35(a), for correction of his sentence on the ground that it "was, in part, based on the

erroneous allegation that the Defendant was conspiring to trans-ship U.S. manufactured parts that

control satellites." (Def. Rule 35 Br. (Dkt. No. 34) at 1)  In response to Petitioner's motion, the

Government stated that its

> assertion [at sentencing] that the parts at issue – beacon receivers and tracking
> controllers – are used to control satellites was incorrect.  Rather, beacon receivers
> are components of a satellite system that are used to receive positioning
> information from an orbiting satellite and then use that information to determine
> the optimal position for ground-based antennae to best communicate with the
> satellite.  Tracking controllers are used to position the ground-based antennae
> once this optimal position is determined.  Therefore, while these parts do not
> actually control the orbiting satellite itself, the parts are critical in monitoring and
> positioning antennae used in satellite communications.

(Govt. Opp. to Def. Rule 35 Motion (Dkt. No. 49) at 1-2)

---

[3]  In the plea agreement, the parties stipulated to a Guidelines range of 57 to 71 months'
imprisonment.  (Govt. Opp. Br. (Dkt. No. 59), Ex. A (Plea Agmt.) at ___)  Petitioner's crime
carries a five-year maximum sentence, however.  See 18 U.S.C. § 371.  Accordingly, this Court
concluded that the applicable Guidelines range was 57 to 60 months' imprisonment.  (Sent. Tr.
(Dkt. No. 45) at 26)  In imposing a sentence of 30 months' imprisonment, this Court granted a
variance based on case law submitted by defense counsel demonstrating that many similarly
situated defendants had received sentences "shorter than the guidelines range applicable here."
(Id. at 27)

On January 22, 2014, this Court denied Petitioner's motion for correction of his sentence. (Dkt. No. 52)  As an initial matter, this Court found that it lacked jurisdiction to correct Petitioner's sentence under Rule 35(a) "because more than fourteen days ha[d] passed since the Court's oral announcement of sentence. . . ." (Id. at 1-2 (citing United States v. Abreu-Cabrera, 64 F.3d 67, 73 (2d Cir. 1995))  This Court also found, however, that even if it had jurisdiction to correct Petitioner's sentence, "his motion would fail on the merits." (Id. at 2)

This Court rejected Petitioner's argument that his sentence was based in part on "the erroneous allegation that [Petitioner] was conspiring to trans-ship U.S. manufactured parts that control satellites." (Pet. Rule 35 Br. (Dkt. No. 34) at 1)  While recognizing that the Court had noted at sentencing the Government's argument that "'some of the equipment at issue here has a role in monitoring, positioning, and controlling satellites and satellite antennas,'" (Jan. 22, 2014 Order (Dkt. No. 52) at 3 (quoting Sent. Tr. at 24 (emphasis added in Jan. 22, 2014 Order))), this Court stated that its "sentence was based on far more than the nature of the equipment [Petitioner] provided to Iran." (Id.)  This Court quoted extensively from the sentencing transcript in demonstrating that its "sentence did not turn on the mistaken view that [Petitioner] had sold equipment to Iran that is used to control satellites." (Id. at 3-5)

On October 30, 2013, Petitioner moved to "set aside and reduce [his] sentence" pursuant to 28 U.S.C. § 2255.  (Pet. Br. (Dkt. No. 70) at 1)  On January 29, 2014, Petitioner filed a supplemental letter to his Section 2255 petition, arguing that "[t]he fact that the offense conduct [was] even arguably legal at the time of sentencing creates an unwarranted disparity between [Petitioner's] sentence and other sentences for IEEPA violations – a factor to be avoided." (Jan. 29, 2014 Pet. Ltr. (No. 13 Civ. 7708, Dkt. No. 6) at 1)  At Petitioner's request, this Court conducted a conference on January 29, 2014 to discuss Petitioner's motion. (See Jan.

29, 2014 Conf. Tr. (Dkt. No. 60))  The Government responded to Petitioner's motion on February 12, 2014 (Dkt. No. 59), and Petitioner filed a reply on March 7, 2014.  (No. 13 Civ. 7708, Dkt. No. 11)

On March 27, 2014, Petitioner filed a motion to supplement his Section 2255 motion, arguing that General License D-1 clarifies that Petitioner's "conduct was legal at the time he was sentenced."  (Pet. Motion to Supplement 28 U.S.C. § 2255 Motion (Dkt. No. 63) at 2)  On May 6, 2014, Petitioner filed a letter "seeking the Court's permission to amend and supplement [his] initial 2255 motion . . . ."  (May 6, 2014 Pet. Ltr (Dkt. No. 67) at 1)  Petitioner states that, "[b]ased upon the recent regulation[] changes legalizing [Petitioner's] offense conduct, [he is], in addition to [his] application to vacate, modify and reduce [his] sentence, seeking to vacate [his] plea."  (Id. at 1-2)  Petitioner states that he "presented the legal basis for this position in [his] reply to the government's opposition to [his] habeas corpus motion, [but] failed to seek the relief now being requested."[4]  (Id. at 2)

## DISCUSSION

## I.  STANDARD FOR RELIEF UNDER SECTION 2255

Title 28, United States Code, Section 2255 provides, in pertinent part:

---

[4]  Although Petitioner was released from custody on December 8. 2014 (Pet. For Writ of Mandamus, No. 15-3595 (Nov. 10, 2015) at 6), on November 10, 2015, he filed a petition for a writ of mandamus with the Second Circuit, seeking an order requiring this Court to rule on his pending Section 2255 motion.  Although the Second Circuit has not yet ruled on Petitioner's request, this Court retains jurisdiction over Petitioner's pending motions.  See In the Matter of the Vendo Company, 435 U.S. 994, 994 (1978) (dismissing as moot petitioner's request for a writ of mandamus seeking an order directing the district court to dissolve a preliminary injunction because the lower court had issued an order dismissing the injunction almost two months after the petition was filed); see also Saghir v. Secretary, U.S. Dept. of Homeland Security, No. 09-MC-26S, 2009 WL 1873779, at *1 (W.D.N.Y. June 30, 2009) (dismissing as moot petitioner's request for a writ of mandamus directing the Department of Homeland Security to process her application for naturalization as moot because the application had been denied shortly after her petition was filed).

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "Relief under section 2255 is available only 'for constitutional error, lack of jurisdiction, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" Rosa v. United States, 170 F. Supp. 2d 388, 396 (S.D.N.Y. 2001) (quoting Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (internal quotation marks and citations omitted)).

## I.   IN CUSTODY REQUIREMENT AND MOOTNESS

Petitioner was released from prison on December 8, 2014, when his 30-month term of imprisonment expired. 2014 (Pet. For Writ of Mandamus, No. 15-3595 (Nov. 10, 2015) at 6)  Accordingly, it is necessary to consider whether (1) he may pursue a claim for relief under 28 U.S.C. § 2255, which refers to a "prisoner in custody"; and (2) his petition presents a justiciable "case or controversy" within the meaning of Article III.

### A.   Section 2255's "In Custody" Requirement

In determining whether a habeas petitioner is "in custody" for purposes of Section 2255, courts look to petitioner's status "as of the time the petition for habeas corpus is 'filed.'" Wilson v. United States, No. 09 Cr. 1086(DAB)(GWG), 2014 WL 748510, at *4 (Feb. 26, 2014) (citing Carafas v. LaVallee, 391 U.S. 234, 238 (1968); Spencer v. Kemna, 523 U.S. 1, 7 (1998); Aponte v. Brown, Nos. 09-CV-4334 (CBA), 2011 WL 797406, at *2 (E.D.N.Y. Feb. 28, 2011)); see also Ramirez v. Immigration & Naturalization Service, 86 F.Supp.2d 301, 302-03 (S.D.N.Y. 2000) ("All of the federal habeas corpus statutes—28 U.S.C. §§ 2241, 2254, 2255—require the

petitioner to be 'in custody' when the habeas petition is filed.") (citing <u>Spencer</u>, 523 U.S. 1;

<u>Carafas</u>, 391 U.S. at 238; <u>Maung v. McElroy</u>, 98 Civ. 5380(SHS)(AJP), 1998 WL 896709, at *2

(S.D.N.Y. Dec. 10, 1998)); <u>Concepcion v. U.S.</u>, 568 F. Supp. 766, 770 (S.D.N.Y. 1982)

(rejecting a § 2255 claim because "Petitioner did not file is petition while he was incarcerated

pursuant to the conviction under attack . . . nor was petitioner serving a consecutive or successive

sentence").

  Because Petitioner was in custody at the time his habeas petition was filed, the

fact that his term of imprisonment has been completed does not deprive this court of jurisdiction

to consider his petition.

**B.**  **Article III "Case or Controversy" Requirement**

  Where a habeas petitioner no longer "in custody" seeks to challenge his sentence

or underlying conviction, he must allege "some concrete and continuing injury other than the

now-ended incarceration or parole – some 'collateral consequence' of the conviction – must exist

if the suit is to be maintained [consistent with Article III's "case or controversy" requirement]."

<u>Spencer</u>, 523 U.S. at 7 (citing <u>Carafas</u>, 391 U.S. at 238).

  **1.**  **Motion to Vacate, Modify, or Reduce Sentence**

  Petitioner asks this Court "to set aside and reduce [his] sentence" pursuant to

Section 2255. (Dkt. No. 50; Dkt. No. 70)  Courts "have declined to presume the existence of

collateral consequences" in such circumstances.  <u>Adams v. New York</u>, No. 07 CV

1101(NG)(LB), 2007 WL 4565033, at *2 (E.D.N.Y. Dec. 21, 2007).  In seeking to demonstrate

that his petition is – as to his sentence – not moot, Petitioner cannot prove negative collateral

consequences through mere "speculation."  <u>Spencer</u>, 523 U.S. at 16.  Instead, Petitioner must

point to a particular "injury in fact" – that is, a "concrete and continuing injury other than the

now-ended incarceration or parole" – not merely the potential for such an injury. Id. at 7. In Spencer, although the Court found that the petitioner could theoretically be subject to a future parole revocation and sentencing proceeding, there was not insufficient evidence to suggest that he would actually face such consequences. Id. at 14-16. See also Atwood v. Williams, No. 10 Civ. 2557(RJS)(HBP), 2011 WL 1991452, at *2 (S.D.N.Y. May 19, 2011) (challenge to denial of "merit time" for early release is moot after petitioner is released from prison); United States v. Mercurris, 192 F.3d 290, 292-93 (2d Cir. 1999) (challenge to the application of a Sentencing Guidelines enhancement moot where defendant had already served his prison sentence and been deported).

Here, Petitioner has completed his 30-month sentence of imprisonment and is not subject to any term of supervised release. Because Petitioner has not demonstrated that modifying his sentence will "'relieve him of some concrete and identifiable collateral effect of that sentence,'" this Court lacks Article III jurisdiction over his claim for relief. Gully v. United States, No. 05 Civ. 1845(KTD), 2011 WL 347413, at *1 (S.D.N.Y. Feb. 1, 2011) (quoting United States v. Hamdi, 432 F.3d 115, 118 (2d Cir. 2005)). Accordingly, to the extent that Petitioner's Section 2255 petition challenges his sentence, his petition must be denied for lack of jurisdiction.[5]

### 2.   **Motion to Vacate Plea**

In a May 6, 2014 letter, Petitioner argues for the first time that his guilty plea should be vacated. (Dkt. No. 67) In seeking to vacate his plea, Petitioner relies on the same arguments previously made in connection with the application to set aside and reduce his

---

[5] Although this Court concludes that it has no jurisdiction to consider Petitioner's motion to set aside and reduce his sentence, it nonetheless addresses Petitioner's claims on the merits, in part because Petitioner relies on the same arguments in connection with his motion to vacate his plea.

sentence:  the Government's misrepresentation concerning the nature of the beacon receivers, and the issuance of General License D.  (Id.)

For purposes of a habeas proceeding, courts "have been willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur)." Spencer, 523 U.S. at 8 (citing Sibron v. New York, 392 U.S. 40, 55-56 (1968)); United States v. Mercurris, 192 F.3d 290, 293 (2d Cir. 1999) ("In cases involving a challenge to the criminal conviction itself the Supreme Court 'has been willing to presume the existence of collateral consequences sufficient to satisfy the case or controversy requirement . . . .'") (quoting United States v. Probber, 170 F.3d 345, 348 (2d Cir. 1999) (emphasis in Probber).  This presumption is attributable to "the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." Sibron, 392 U.S. at 55.  Accordingly, a habeas petitioner seeking to challenge his conviction need not make any particular showing of an injury-in-fact to sustain Article III jurisdiction after being released from custody.

Accordingly, to the extent that Petitioner's Section 2255 motion is premised on the argument that he should be permitted to withdraw his plea, this Court will presume that there are ongoing collateral consequences to Petitioner's conspiracy conviction, and thus that a justiciable "case or controversy" exists.

## II.   PETITIONER'S FAILURE TO APPEAL

The Government argues that Petitioner's claims are barred because of his failure to appeal his conviction and sentence.

A.      **Applicable Law**

"A motion under [Section] 2255 is not a substitute for an appeal." United States

v. Munoz, 143 F.3d 632, 637 (2d Cir. 1998); accord Rosario v. United States, 164 F.3d 729, 732

(2d Cir. 1998).  Rather, it is a "collateral attack on a final judgment" that – as noted above –

generally affords relief "only for a constitutional error, a lack of jurisdiction in the sentencing

court, or an error of law or fact that constitutes a 'fundamental defect which inherently results in

complete miscarriage of justice.'"  United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting

Hill v. United States, 368 U.S. 424, 428 (1962)).

"Because collateral challenges are in 'tension with society's strong interest in the

finality of criminal convictions, the courts have established rules that make it more difficult for a

defendant to upset a conviction by collateral, as opposed to direct, attack.'"  Yick Man Mui v.

United States, 614 F.3d 50, 53 (2d Cir. 2010) (quoting Ciak v. United States, 59 F.3d 296, 301

(2d Cir. 1995), abrogated on other grounds by Mickens v. Taylor, 535 U.S. 162 (2002)).  One

such rule "prevents [Section 2255] claims that could have been brought on direct appeal from

being raised on collateral review absent cause and prejudice."  Yick Man Mui, 614 F.3d at 54.

"This rule also applies where the defendant fails to appeal at all."  Rosa, 170 F. Supp. 2d at 396

(citing United States v. Pipitone, 67 F.3d 34, 38 (2d Cir. 1995)).  An exception applies, however,

where a petitioner "'can establish both cause for the procedural default and actual prejudice

resulting therefrom.'"  Hernandez v. United States, No. 02 Civ. 1663(JGK), 2003 WL 223467, at

*2 (S.D.N.Y. Jan. 31, 2003) (citing Billy-Eko v. United States, 8 F.3d 111, 113-14 (2d Cir. 1993)

(citations omitted)).

"The '"cause" under the cause and prejudice test must be something external to

the petitioner, something that cannot be fairly attributed to him.'"  Viera v. United States, 832 F.

Supp. 2d 222, 227 (E.D.N.Y. 2011) (quoting Coleman v. Thompson, 501 U.S. 722, 752 (1991)) (emphasis in Coleman).  For example, "'a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that "some interference by officials" . . . made compliance impracticable, would constitute cause under this standard.'"  Coleman, 501 U.S. at 753 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  "The prejudice prong requires that the petitioner show 'actual prejudice,' . . . 'not merely that the errors . . . created a possibility of prejudice, but that they worked to [the petitioner's] actual and substantial disadvantage . . . .'" Femia v. United States, 47 F.3d 519, 524 (2d Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)) (emphasis in Frady).

**B.      Analysis**

Here, Petitioner filed no direct appeal.  Petitioner argues, however, that "[t]he time to appeal lapsed as a direct result of the Government's misrepresentations and its delay in admitting those misrepresentations," and thus "the Government's actions have caused [Petitioner's] inability to timely appeal."  (Pet. Reply Br. (No. 13 Civ. 7708, Dkt. No. 11) at 4)  Specifically, Petitioner contends that the Government (1) misrepresented before and at sentencing that the beacon receivers at issue in this case control satellites, and (2) included factual allegations in the Complaint – which were then adopted in the PSR – that are "incorrect." (Id.)  Petitioner further contends that his "inability to timely appeal[] result[ed] in actual prejudice."  (Id.)

**1.      Cause**

Petitioner argues that because the Government "did not admit its misrepresentations [concerning the beacon receivers] until 43 days after the sentence was handed down," he has established cause for his failure to appeal.  (Id.)  Accepting Petitioner's argument

that the Government did not acknowledge its mistake until September 25, 2013, Petitioner

addressed this issue at sentencing, arguing that the beacon receivers at issue "move[] the antenna

so that it can actually track satellites and get the beacon.  This is receiver equipment. . . . [that]

is[] now[] lawful [to export to Iran]" under General License D.  (Sent. Tr. (Dkt. No. 45) at 8)

Accordingly, Petitioner was not only aware of his present claim at sentencing, but actually raised

it at sentencing.

   Petitioner also raised this argument in his Rule 35 motion, which was filed

fourteen days after his sentencing (see Dkt. No. 34) and within the time period allowed for the

filing of a notice of appeal.  See Fed. R. App. P. 4(b).  In his Rule 35 motion, Petitioner argued

that his sentence "was, in part, based on the erroneous allegation that [he] was conspiring to

trans-ship U.S. manufactured parts that control satellites."  (Def. Rule 35 Br. (Dkt. No. 34) at 1)

   "The futility test to excuse a default is strict: 'the question is not whether

subsequent legal developments have made counsel's task easier, but whether at the time of the

default the claim was "available" at all.'"  United States v. Thorn, 659 F.3d 227, 233 (2d Cir.

2011) (quoting Smith v. Murray, 477 U.S. 527, 537 (1986)).  Given that Petitioner made the

same arguments to this Court at sentencing and in his Rule 35 motion that he raises now,

Petitioner's claim regarding the nature of the beacon receivers was clearly available at the time

of his default.  See Piervinanzi, 151 F. Supp. 2d at 272 ("Piervinanzi's . . . claim . . . was quite

obviously available to him on direct appeal, as he made the same argument previously at his

sentencing hearing . . . and cited case law to support his claim.").  Accordingly, Petitioner has

not shown cause for his failure to file a direct appeal raising the arguments he raises here

concerning the true nature of the beacon receivers.

Petitioner also argues that the PSR adopts factual allegations from the Complaint that are incorrect, and that he did not discover these misrepresentations until after his time to file a direct appeal expired. (Pet. Reply Br. (No. 13 Civ. 7708, Dkt. No. 11) at 4) Petitioner states that, although "Paragraph 22[j] of the PSR, taken directly from the Complaint, alleges that the five U.S. manufactured beacon receivers were ultimately shipped to Iran,"[6] a "letter from the United Arab Emirates' ["UAE"] Department of Seaport & Customs" – which Petitioner obtained after sentencing – "states [that] the beacon receivers were shipped to the UAE, were not cleared, and have never left the UAE."[7] (Pet. Br. (Dkt. No. 70) at 5) Petitioner does not explain, however, why this claim was not "reasonably available to counsel," or why it would have been "impracticable" to discover these errors, at the time of default. See Coleman, 501 U.S. at 753 (internal quotation marks and citation omitted). The fact that Petitioner allegedly discovered a

---

[6] The PSR states: "From subsequent communications to or from [the] employees [of Skylinks – a company that Petitioner partly owned –] it was learned that the [beacon] [r]eceivers were shipped to Kuala Lampur[, Malaysia,] before the [r]eceivers were forwarded to IKA,[] an abbreviation for 'Tehran Imam Khomeini International Airport,' located in Iran." (PSR ¶ 22(j))

[7] The letter – which is signed by Khaled Bin Abdullah Bin Sultan Al Qasimi, the Chairman of the UAE Department of Seaports & Customs – states, in part:

> This is to confirm the verification and status of cargo arrived at Sharjah Seaport on 08.05.2012 . . . :
>
> - Quantity of Five units of Satellite Beacon Receivers, Satellite Systems Corporation Brand, Model 3430L found in this shipment.
>
> - . . . . Date of manufacture: 11 April 2011.
>
> - Serial numbers of the five Beacon Receivers are 18723, 18724, 18725, 18726 & 18727.
>
> - The cargo was inspected by Sharjah Customs upon its arrival.
>
> - The cargo was not cleared from the Customs within the allowed period by producing the required approval from the UAE concerned authorities and hence confiscated in accordance of the UAE Customs regulations.

(Pet. Br. (Dkt. No. 70), Ex. I at 1)

factual error in the PSR after his time to file a direct appeal expired does not establish that an external factor caused his default.

### 2.    Prejudice

Even if Petitioner could establish cause for his procedural default, he has not shown that he was prejudiced by the Government's misrepresentation concerning the function of the beacon receivers.  As explained in the January 22, 2014 order denying Petitioner's Rule 35 motion, this Court's 30-month sentence "was based on far more than the nature of the equipment [Petitioner] provided to Iran."  (Jan. 22, 2014 Order (Dkt. No. 52) at 3-5 (citing Sent. Tr. (Dkt.No. 45) at 22-24, 27, 30))  The Court explained its reasons in detail at sentencing, (Sent. Tr. (Dkt. No. 45) at 22-24, 27, 30), and those reasons had nothing to do with whether the equipment controlled satellites.  To the extent that defense counsel focused on the nature of the beacon receivers at sentencing, it was to argue that Petitioner should receive a lesser sentence because – under General License D – it was now lawful to ship the beacon receivers at issue to Iran.  (Id. at 6-8)  This Court rejected the notion that Petitioner's culpability over the seven year period during which his criminal activity took place should be determined by a regulation promulgated after his criminal conduct ended, however.  See id. at 24 ("I cannot place reliance on the fact that, recently, a regulation has come into effect which permits the export of certain electronic equipment to Iran.").

Because "this Court's sentence did not turn on the mistaken view that [Petitioner] had sold equipment to Iran that is used to control satellites," the Government's misrepresentation at sentencing regarding the nature of the beacon receivers did not prejudice Petitioner.  (Jan. 22, 2014 Order (Dkt. No. 52) at 5)

As to the assertion in the UAE Customs letter that the five beacon receivers never reached Iran because they were confiscated in the UAE, this Court's sentence did not turn on whether the beacon receivers actually reached Iran.  Petitioner does not contend that the PSR is incorrect in stating that Petitioner "and other individuals purchased five Beacon Receivers . . . from . . . a United States supplier, for the purpose of trans-shipping [them] to an Iranian customer."  See PSR ¶ 22.  Assuming arguendo that the beacon receivers "[were] not cleared from . . . Customs" in the UAE (Pet. Br. (Dkt. No. 70), Ex. I at 1), this fact does not change any of the findings that this Court made at sentencing, including that (1) "[b]ecause there is a trade embargo in place that prohibits the sale of most U.S.[-]made goods to Iran, the U.S.[-]made equipment at issue here was shipped through intermediary destinations such as Dubai, Mal[aysia], Hong Kong, and elsewhere, in order to obscure the goods' true destination [of Iran]"; (2) Petitioner "was well aware of the laws prohibiting the sale of U.S.[-]made goods to Iran"; (3) Petitioner "instructed his employees to disguise the fact that his employees were selling this merchandise to Iran"; and (4) "[a]s a result of [Petitioner's] conduct, his employees lied to U.S. customs inspectors as to the ultimate destination of merchandise."  (Sent. Tr. (Dkt. No. 45) at 22-23)  These facts are sufficient to justify this Court's conclusion that Petitioner had "engaged in extremely serious criminal conduct" and "knowingly and intentionally chose to violate U.S. law designed to enforce the [Iranian] trade embargo."  (Id. at 24)  Because the Government's misrepresentation concerning the nature of the beacon receivers did not "work[] to [Petitioner's] actual and substantial disadvantage," Femia, 47 F.3d at 524 (emphasis omitted), Petitioner has not established that he suffered prejudice as a result of that misrepresentation.

This Court concludes that Petitioner has not demonstrated either cause or prejudice in connection with his failure to file a direct appeal.

23

### 3.    Whether a Failure to Consider Petitioner's Claims Would Result in a Fundamental Miscarriage of Justice or Permit a Judgment Resulting from Constitutional Error to Stand

"[E]ven if a petitioner cannot demonstrate cause [for and prejudice resulting from a procedural default], there is no procedural bar where the 'failure to consider the claims will result in a fundamental miscarriage of justice,'" Cannavo v. United States, 860 F. Supp. 145, 148 n.7 (S.D.N.Y. 1994) (quoting Coleman, 501 U.S. at 750), or where the judgment is the result of "constitutional error." Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (internal quotation marks and citation omitted). Petitioner argues that his petition is not procedurally barred because (1) the Government's misrepresentation violated Petitioner's due process rights, and (2) the conduct for which he was sentenced was lawful at the time of sentencing.

### a.    Whether the Government's Misrepresentation and Alleged Errors in the PSR Violated Petitioner's Due Process Rights

Petitioner argues that (1) the Government's misrepresentation as to the nature of the beacon receivers, and (2) the factual errors in the PSR "created a clear miscarriage of justice" that violated Petitioner's due process rights. (Pet. Br. (Dkt. No. 70) at 4) With respect to the beacon receivers, Petitioner argues that "the Court imposed a 30 month period of imprisonment" "[r]elying, in part, upon the Government's misrepresentations that the items 'controlled satellites' and that the exportation of the material may still be in violation of federal law. . . ." (Id. at 4) With respect to the factual errors in the PSR, Petitioner argues that "[t]hese inaccurate 'facts' represent 'material false assumptions as to [a] fact relevant to sentencing, [and] renders the entire sentencing procedure invalid as a violation of due process.'" (Pet. Rep. Br. (No. 13 Civ. 7708, Dkt. No. 1) at 3 (quoting United States v. Malcolm, 432 F.2d 809, 816 (2d Cir. 1970)))

24

Despite the Government's misrepresentation regarding the nature of the beacon receivers at issue and the PSR's alleged inaccuracy with respect to whether the beacon receivers ever reached Iran, Petitioner has not demonstrated "that such [] harm[s] rise[] to the level of the deprivation of liberty without due process of law." United States v. Arevalo, 628 F.3d 93, 99 (2d Cir. 2010). As discussed above, this Court's sentence did not turn on whether Petitioner had sold equipment to Iran that is used to control satellites. Accordingly, the Government's misrepresentation regarding the nature of the beacon receivers did not violate Petitioner's due process rights.

The inconsistency between the PSR and the UAE Customs letter concerning whether the five beacon receivers ever reached Iran likewise does not demonstrate that Petitioner was deprived of his liberty without due process of law. "This is not a case where the defendant was denied due process because he was not given an opportunity to contest the presentence report at his sentencing proceeding." Arevalo, 628 F.3d at 99 (citing United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996) ("All that is required [at sentencing] is that the court afford the defendant some opportunity to rebut the Government's allegations.") (internal quotation marks and citation omitted)).

Here, the Probation Office addressed all of defense counsel's objections to the PSR through corrections, deletions, or the addition of clarifying material. See PSR at 25-26. Moreover, at defense counsel's request, the Probation Office added a statement as to paragraphs 7 through 23 of the PSR that "defense counsel has not had [the] opportunity to review the underlying documents and [is] unable to comment on the accuracy of the quotations and characterizations [set forth in these paragraphs]." Id. at 4, 25. At sentencing, this Court inquired of defense counsel whether he had "any objections to the factual portions of the presentence

report." Counsel answered that he had no objections "that are not already noted in the report itself. . . ." (Sent. Tr. (Dkt. No. 45) at 3) In sum, Petitioner has not demonstrated that he objected to any factual error in the PSR that was not corrected or otherwise addressed by the Probation Office.

Petitioner has likewise not demonstrated that he was denied due process because this Court relied on inaccurate information in determining his sentence. As discussed above, this Court's sentence did not turn on whether the five beacon receivers discussed in paragraph 22 of the PSR actually reached Iran. Moreover, Petitioner was provided opportunities both before and at sentencing to contest the presentence report, and to the extent that Petitioner objected to the factual portions of the PSR, those objections were addressed. See PSR 25-26. Under these circumstances, "the mere existence of inaccurate information in a presentence report, rather than a district court's reliance on such information in sentencing, [does not] constitute[] a due process violation [and is not] an error sufficient to void an appeal waiver." Arevalo, 628 F.3d at 99. Because Petitioner has not pointed to any specific inaccuracies in the PSR that this Court relied on in imposing sentencing, he has not established a violation of his due process rights.

> **b.** **Whether the Issuance of General License D Provides a Basis for Petitioner to Collaterally Attack His <u>Sentence Despite His Failure to File a Direct Appeal</u>**

Petitioner argues that he should be permitted to collaterally attack his sentence because General License D rendered his conduct lawful at the time of sentencing. (Pet. Reply Br. (No. 13 Civ. 7708, Dkt. No. 11) at 2-8)

Petitioner points to several cases in this Circuit that "permit petitioners to attack collaterally their sentences . . . when the substantive law underlying their convictions is abrogated, rendering their formerly illegal conduct legal." Piervinanzi v. United States, 151 F.

Supp. 2d 266, 270 (S.D.N.Y. 2001) (citing Davis v. United States, 417 U.S. 333 (1974); United States v. Loschiavo, 531 F.2d 659 (2d Cir. 1976)); see Pet. Reply Br. (No. 13 Civ. 7708, Dkt. No. 11) at 2-4.

      In Davis, the Supreme Court held that petitioner could collaterally attack his conviction for failing to comply with a Selective Service Act induction order where the induction order was the product of regulations found invalid after Davis's conviction. Davis, 417 U.S. 346-47. In Loschiavo, petitioner was permitted to collaterally attack his conviction for bribery under 18 U.S.C. § 201 where – after his conviction – the Second Circuit had determined that the public official petitioner had bribed was not a federal "public official" within the meaning of Section 201. Loschiavo, 531 F.2d at 667. While Davis and Loschiavo demonstrate that intervening changes in the law can sometimes provide a basis for habeas relief, the change in law at issue here is fundamentally different than the change in law that Davis and Loschiavo reflect.

      In Davis, the Supreme Court concluded that Section 2255 provides a vehicle to collaterally attack a conviction based on the violation of an induction order issued under regulations that were invalid ab initio. Davis, 417 U.S. at 346-47. Similarly, in Loschiavo, the Second Circuit concluded that habeas relief was available where an intervening court decision indicated that Loschiavo had been "convicted for a federal offense that did not exist." Loschiavo, 531 F.2d at 665-66. Davis and Loschiavo thus constitute decisions in which courts announced what the law, properly interpreted, always was. By contrast, General License D does not purport to make lawful that which was unlawful prior to May 30, 2013, when OFAC issued General License D.

      Although General Licenses D and D-1 authorize the export of equipment to Iran that was previously prohibited under the ITR, these new provisions do not purport to apply

retroactively to bless transactions that the ITR previously prohibited. Indeed, General Licenses

D and D-1 have no application to conduct that took place prior to their issuance. The new

licenses merely reflect OFAC's determination that, as of the effective date of those licenses and

prospectively, it was appropriate to exempt certain transactions from the ITR's prohibitions. See

Def. Sent. Br. (Dkt. No. 20), Ex. 5 ("General License D"); OFAC General License D-1, Section

(e), available at http://www.treasury.gov/resource-center/sanctions/Programs/Documents/iran_

gld1.pdf; see also OFAC FAQs: Iran Sanctions, U.S. Department of the Treasury,

https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_iran.aspx ("On May 30,

2013, the Department of the Treasury, in consultation with the Departments of State and

Commerce, issued General License D . . . authorizing the export and reexport to Iran of certain

hardware, software, and services incident to personal communications."). Accordingly, the cases

cited by Petitioner – which "permit petitioners to attack collaterally their sentences . . . when the

substantive law underlying their convictions is abrogated, rendering their formerly illegal

conduct legal," Piervinanzi, 151 F. Supp. 2d at 270 (citations omitted) – have no application

here.

        Petitioner also errs in arguing that "the Court must apply the law in effect at the

time it renders its decision," and General License D made Petitioner's conduct legal at the time

of sentencing. (Pet. Reply Br. (No. 13 Civ. 7708, Dkt. No. 11) at 5-8) "Supreme Court and

Second Circuit case law supports the Government's contention that it is the law at the time of the

offense . . . that governs." Smith, 354 F.3d at 173. There is no evidence here that OFAC

intended General License D to have retroactive effect:

> the present case is not one in which Congress [or the Executive Branch] has
> repudiated the merits of a prior public policy. . . . [Petitioner] may well be correct
> that [the Executive Branch] intended to encourage [the export of certain goods to
> Iran] after the lifting of the sanctions [concerning those goods]. However, there is

simply no reason to think that it intended to give amnesty to persons who had violated the sanctions <u>while</u> they were in effect . . . .

<u>United States v. van den Berg</u>, 5 F.3d 439, 445 (9th Cir. 1993) (emphasis in original).

Accordingly, sentencing Petitioner based on the law that existed at the time of his offense does not constitute a "complete miscarriage of justice . . . that justif[ies] collateral relief under § 2255." <u>Davis</u>, 417 U.S. at 346-47 (internal quotation marks omitted).

*  *  *  *

Because Petitioner has not established cause or prejudice for his failure to file a direct appeal, and because he has not demonstrated that he otherwise suffered from a constitutional error or an error that resulted in a complete miscarriage of justice, his failure to file a direct appeal constitutes a procedural bar that prevents him from collaterally attacking his sentence pursuant to Section 2255.[8]

## III. <u>WAIVER OF RIGHTS IN PLEA AGREEMENT</u>

Even if Petitioner's failure to file a direct appeal did not bar his Section 2255 petition, his petition to set aside his sentence is foreclosed by the plea agreement, in which he waived his right to appeal or collaterally attack any sentence within or below the stipulated Guidelines range of 57 to 71 months' imprisonment.

### A. <u>Applicable Law</u>

"The Second Circuit has repeatedly held that, absent extraordinary circumstances, a knowing and voluntary waiver of the right to appeal a sentence within or below the agreed Guidelines range is to be enforced." <u>Pena v. United States</u>, 201 F. Supp. 2d 231, 233-34 (S.D.N.Y. 2002) (collecting cases); <u>see also</u> <u>Garcia-Santos v. United States</u>, 273 F.3d 506, 509

---

[8] To the extent that Petitioner argues that the facts discussed above provide a basis for this Court to vacate his plea, Petitioner's claim is rejected for the same reasons discussed above.

(2d Cir. 2001) ("[The Second Circuit] [has] long enforced waivers of direct appeal rights in plea agreements, even though the grounds for appeal arose after the plea agreement was entered into. . . . The reasons for enforcing waivers of direct appeal in such cases lead us to the same conclusion as to waivers of collateral attack under § 2255.") (citing United States v. Yemitan, 70 F.3d 746, 747-48 (2d Cir. 1995)). Allowing a defendant to "'appeal the merits of a sentence conforming to [a plea] agreement . . . would render the plea bargaining process and the resulting agreement meaningless.'" Pena, 201 F. Supp. 2d at 234 (quoting United States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir. 1993)). "Other reasons articulated by courts to support limits on the relief permitted under § 2255 include the finality of criminal sentences, the efficient allocation of judicial resources and the aversion of retrying issues years after the underlying events took place." Id. (citing United States v. Addonizio, 442 U.S. 178, 184 n.11 (1979)).

"To be enforceable, guilty pleas and waivers of right to appeal sentence must be knowing and voluntary." United States v. Roque, 421 F.3d 118, 122 (2d Cir. 2005) (citing United States v. Martinez-Rios, 143 F.3d 662, 668 (2d Cir. 1998)). "The knowing and voluntary requirement is satisfied when the court holds a hearing and informs the defendant of the Government's charges against him and the nature of his agreement, including the acknowledgement that he is waiving his right to appeal." Paredes-Cisnero v. United States, 869 F. Supp. 2d 402, 405 (S.D.N.Y. 2012) (collecting cases). "As a result, [courts] find waivers unenforceable only in very limited situations, 'such as when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, when the government breached the plea agreement, or when the sentencing court failed to enunciate any rationale for the defendant's sentence.'" United States v. Arevalo, 628 F.3d 93, 98 (2d Cir.

2010) (quoting <u>Gomez-Perez</u>, 215 F.3d at 319 (internal citations omitted)); <u>see also</u> <u>Gomez-</u>

<u>Perez</u>, 215 F.3d at 319-20 ("The[] exceptions to the presumption of the enforceability of a waiver

. . . occupy a very circumscribed area of our jurisprudence.  Accordingly, we have upheld waiver

provisions even in circumstances where the sentence was conceivably imposed in an illegal

fashion or in violation of the Guidelines, but yet was still within the range contemplated in the

plea agreement.") (citations omitted).

    **B.**    <u>**Analysis**</u>

        Here, Petitioner was sentenced to 30 months' imprisonment, well below the 57-

to-71 month Guidelines range to which the parties stipulated in the plea agreement.  Petitioner

does not argue that his plea and waiver of rights was not knowing and voluntary, and the record

contains "no evidence of force, coercion, or compulsion," or that "incapacity or other conditions

affected [Petitioner's] capacity to consider rationally the benefits and costs of his plea."  <u>See</u>

<u>Roque</u>, 421 F.3d at 122.  Nor does Petitioner argue that he did not understand the plea

agreement, or that, at the time of his plea, "he did not understand that he was giving up his right

to appeal and petition under § 2255."  <u>See</u> <u>Garcia-Santos</u>, 273 F.3d at 508.  Instead, Petitioner

argues that the plea agreement's waiver provision should be "trumped" because General License

D represents a change in law that renders Petitioner's plea not knowing or voluntary.[9]  (Pet. Br.

(No. 13. Civ. 7708, Dkt. No. 11) at 3-4 (quoting <u>Stern v. United States</u>, No. 09 Civ.

6044(PAC)(FM), 2013 WL 989382, at *4 (S.D.N.Y. Mar. 14, 2013)))  As discussed above,

---

[9]  Petitioner also argues that enforcing the plea agreement's waiver provision would violate his right to due process because (1) the Government misrepresented the nature of the beacon receivers, and (2) the PSR contains inaccuracies.  (<u>See</u> Pet. Br. (Dkt. No. 70) at 4)  This Court rejects these arguments for the reasons previously discussed.

General License D does not constitute a change in the law as to conduct that occurred prior to its issuance.

The post-plea issuance of General License D does not render Petitioner's plea not knowing or voluntary.  Accordingly, Petitioner's waiver of his right to appeal or to collaterally challenge any sentence within or below the stipulated Guidelines range also bars the instant motion to set aside his sentence. [10]

## CONCLUSION

For the reasons stated above, the petition is denied.  The Clerk of Court is respectfully directed to terminate the motions (13 Civ. 7708 (PGG) Dkt. Nos. 1, 12; 13 Cr. 214 Dkt. Nos. 62, 67) and to close these cases.

Dated:  New York, New York
      November 25, 2015

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[10]  Because the record demonstrates that Petitioner's plea was knowing and voluntary, his motion to vacate his plea (No. 13 Civ. 7708, Dkt. No. 15) is also denied.  See James v. United States, No. 3:02 Cr. 334 (PCD), 2006 WL 1821771, at *3 (D. Conn. June 30, 2006) ("When a judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary.  If the answer is in the affirmative, conviction and plea, as a general rule, forecloses collateral attack.") (citing United States v. Broce, 488 U.S. 563, 569 (1989)).